**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
Lexington Division**

| | |
|---|---|
| In re: ) | |
| ) | **Chapter 11** |
| **TRINITY COAL CORPORATION,** *et al.* [1] ) | Case No. 13-50364 |
| ) | (Jointly Administered) |
| Debtors. ) | Hon. Tracey N. Wise |
| ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ̄ ) | |

**OPINION AND ORDER DENYING
MOTION TO REJECT AGREEMENTS**

This matter is before the Court on Debtors' Motion for an Order Authorizing the Rejection of Certain Agreements ("Motion") [Doc. 394] between Debtor Little Elk Mining Company, LLC ("Little Elk") and ICG Natural Resources, LLC ("Natural Resources") and ICG Hazard, LLC ("Hazard," and together with Natural Resources, the "ICG Entities"). The ICG Entities filed an objection ("Objection") [Doc. 412] to the Motion. Following supplemental briefing [Docs. 1272, 1273, 1279 & 1281] and the filing of Exhibits and Affidavits [Docs. 1283 & 1285], Joint Stipulations and Supplemental Joint Stipulations of Fact [Docs. 1284 & 1297], the parties agreed, at a hearing held on June 25, 2014, to submit the matter on the record.

Upon consideration of the arguments of counsel and the record herein, the Court finds that the agreements sought to be rejected are part of an indivisible, integrated property exchange transaction entered into between Little Elk and the ICG Entities, and, therefore, denies the Motion for the reasons stated below.

---

[1] The Debtors in the above-captioned Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Trinity Coal Corporation (1163); Trinity Parent Corporation (1080); Trinity RMG Holdings LLC (2840); RMG, Inc. (8388); Trinity Coal Partners LLC (4711); Trinity Coal Marketing LLC (3532); Frasure Creek Mining, LLC (9409); Falcon Resources LLC (7742); Prater Branch Resources LLC (3662); Little Elk Mining Company LLC (0373); Levisa Fork Resources LLC (9407); Bear Fork Resources LLC (7993); North Springs Resources LLC (6323); Deep Water Resources LLC (6594); Banner Coal Terminal LLC (9017); and Hughes Creek Terminal LLC (8285).

## JURISDICTION

This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b), and it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## MOTION AND OBJECTION

Pursuant to 11 U.S.C. § 365, the Debtors move to reject two contracts with the ICG Entities.  The first contract is a Disposal Agreement dated June 23, 2008, entered into between Little Elk and the ICG Entities, and second is an Easement Agreement also dated June 23, 2008, entered into between Little Elk and Hazard.[2]  The Disposal Agreement and Easement Agreement are referred to collectively as the "ICG Agreements."

The ICG Entities raise several objections to the Motion, including an argument that the ICG Agreements are an indivisible part of a larger, comprehensive property exchange transaction among the parties that occurred in June 2008; the ICG Agreements cannot be severed from that transaction, and thus, cannot be rejected.

## THE 2008 PROPERTY EXCHANGE TRANSACTION AND RELATED AGREEMENTS

The ICG Entities and Debtor Little Elk have adjacent coal properties located in Breathitt County, Perry County, and Knott County, Kentucky, which they, or their predecessors, acquired in 2004 through separate sales from a prior bankruptcy case.  In 2008, the ICG Entities and Little Elk determined that "the way the property had been divided in 2004 was in some respects cumbersome and illogical."  [Joint Stips ¶ 12; s*ee also* Affidavit of William Gregory Feltner, Doc. 1283-3 ¶¶ 5, 9].  To remedy this, the parties negotiated a comprehensive property exchange that

---

[2] Copies of the Easement Agreement and Disposal Agreement are attached to the parties' Joint Stipulations of Fact ("Joint Stips") [Doc. 1284].

would allow the companies to consolidate their property interests and rights in a way that would facilitate mining and make their respective operations and properties more logical and workable (the "2008 Transaction"). The 2008 Transaction closed on June 23, 2008, involved approximately 5,500 acres of mineral properties and was documented by a series of agreements, all as more particularly described in a master Property Exchange Agreement ("Exchange Agreement") [Doc. 1273-5]. The purpose of the 2008 Transaction was for the parties to "exchange certain interests in their respective coal rights and surface tracts and to take other actions to enable each of them to conduct their respective coal mining operations more efficiently." [Exchange Agreement, Recitals ¶ F].

The Exchange Agreement described the various transactions that were to take place at the closing and defined sixteen "Ancillary Documents," all of which were to be executed at closing. The Exchange Agreement and Ancillary Documents are collectively referred to as the "2008 Transaction Agreements." The Easement Agreement and Disposal Agreement, which the Debtors seek to reject, were two of the Ancillary Documents. [Exchange Agreement ¶¶ 2.2(k), 2.2(l)]. The other Ancillary Documents involved (i) the transfer of surface and coal interest; (ii) the assignment and assumption of surface mine permits; and (iii) the execution of a wheelage agreement in favor of Little Elk. [Exchange Agreement ¶¶ 2.2(a)-(j), (m); Joint Stips ¶ 15].

The requirement that all of the Ancillary Documents be executed at closing was dictated by paragraph 2.6 of the Exchange Agreement:

> 2.6  <u>Simultaneous Actions</u>.  Each of the actions required under this Section 2.2 shall be deemed to have occurred simultaneously at the Closing and unless all of such actions are taken, none of the actions provided for in this [Exchange Agreement] shall be taken or be deemed to have been taken, and any acts which may have been performed in respect thereof shall be canceled and treated as if void and of no force and effect.

[Exchange Agreement ¶ 2.6]. The Exchange Agreement also contained the following provision:

3

> 8.4   Entire Agreement and Modification.   This Agreement, including the schedules and *exhibits* attached hereto and made a part hereof, constitutes the entire agreement between the parties.   No changes of, modifications of, or additions to this Agreement shall be valid unless the same shall be in writing and signed by both parties hereto.

[Exchange Agreement ¶ 8.4 (emphasis added)].   The Easement Agreement and Disposal Agreement were attached to the Exchange Agreement as Exhibits 2.2(k) and 2.2(l), respectively, thus constituting a part of the "entire agreement between the parties."

The Easement Agreement.   Pursuant to the Easement Agreement, Little Elk granted to ICG Hazard an easement and right-of-way on and across its land to allow ICG Hazard access, for the purpose of ingress and egress, for an original term of ten years and ten renewal periods of one year each.   Additional rights were granted for ICG Hazard to construct and maintain new roadways with Little Elk's approval.   A recital in the Easement Agreement expressly noted that the agreement was reached pursuant to Section 2.2(k) of the Exchange Agreement:

> C.   Pursuant to Section 2.2(k) of the Exchange Agreement, ICG Hazard and Little Elk agreed to enter into this Easement Agreement to utilize the roadways across the Existing Trinity Boundary and to grant ICG Hazard the limited right to revise the locations of roadways.

[Easement Agreement, Recitals ¶ C].   The "sole consideration" for the rights granted in the Easement Agreement was "the various property rights that the parties have exchanged pursuant to the Exchange Agreement."   [Easement Agreement ¶ 7].

Similar to the Exchange Agreement, the Easement Agreement contained an incorporation provision as follows:

> Entire Agreement.   This Easement Agreement *and the Exchange Agreement* embody the entire agreement and understanding of the parties related to the subject matter hereof, and supersede all prior proposals, understandings, agreements, correspondence, arrangements and contemporaneous oral agreements relating to the subject matter of this Easement Agreement.

4

[Easement Agreement ¶ 10.g (emphasis added)]. As noted above, this provision is consistent with the Exchange Agreement's language defining the "Entire Agreement."

The Disposal Agreement. The Disposal Agreement granted the parties reciprocal rights to dispose of spoil generated from the mining activities of one onto property owned or controlled by the other. As with the Easement Agreement, the Disposal Agreement recitals expressly provided that the Disposal Agreement was reached pursuant to Section 2.2(l) of the Exchange Agreement [Disposal Agreement, Recitals ¶ C], and the "sole consideration" for the disposal rights granted under the Disposal Agreement was "the various property rights that the parties have exchanged pursuant to the Exchange Agreement and the mutual rights and obligations set forth in this Disposal Agreement" [Disposal Agreement ¶ 7]. The incorporation provision contained in the Disposal Agreement mirrored that in the Easement Agreement. [Disposal Agreement ¶ 11.g].

The ICG Entities are continuing to operate mines on the properties in which they obtained rights pursuant to the 2008 Transaction, and they deem continuation of their rights under the ICG Agreements to be essential to their business operations. Little Elk has ceased mining operations, and the Debtors have determined that the ICG Agreements are burdensome to their estates.

LAW AND ANALYSIS

Under the Bankruptcy Code, a debtor-in-possession is permitted to assume or reject unexpired leases or executory contracts. 11 U.S.C. § 365(a). To determine the applicability of this provision, the Court "must first identify what constitutes the agreements at issue." *Lewis Bros. Bakeries, Inc. v. Interstate Brands Corp. (In re Interstate Bakeries Corp.)*, 751 F.3d 955, 961 (8th Cir. 2014). Where multiple contracts are intended to comprise one agreement or transaction, a party may not sever them for purposes of assumption or rejection. *See, e.g., In re LG Philips Displays USA, Inc.*, No. 06-10245 (BLS), 2006 WL 1748671, at *4 (Bankr. D. Del. June 21, 2006)

("[A]ll of the contracts that comprise an integrated agreement must be either assumed or rejected, since they all make up one contract." (citations omitted) (internal quotation marks omitted)). Here, the parties agree that if the ICG Agreements are integrated with the Exchange Agreement such that the 2008 Transaction Agreements form one indivisible contract, the Debtors cannot reject the ICG Agreements.

Contract interpretation is a matter of state law. *KFC Corp. v. Wagstaff Minnesota, Inc. (In re Wagstaff Minnesota, Inc.)*, Ch. 11 Case No. 11-43073, Adv. No. 11-2450 (JNE/JJG), 2012 WL 10623, at *3 (D. Minn. Jan. 3, 2012):

> Determining whether several documents form one indivisible contract is a matter of contract interpretation governed by state law. The primary job of the Court in interpreting a contract is to ascertain and effectuate the intent of the parties. The Court begins this inquiry by examining the written agreement for evidence of the parties' intent. . . . In determining whether a contract is severable, the intention of the parties is a controlling factor. In considering the parties' intent, the Court looks to their purpose at the time of contract execution. Equitable considerations will prevail against a mechanistic approach as to whether the contract is divisible or indivisible and thus enforceable. In addition to the intent of the parties, courts considering the divisibility of a contract look at the objects to be attained and the common sense of the situation. If the parties' intent cannot be derived from the face of the documents, the Court must engage in a fact intensive inquiry considering a variety of factors.

*Wagstaff Minnesota, Inc.)*, 2012 WL 10623, at *3 (citations omitted) (internal quotation marks omitted). Like the agreements at issue in *Wagstaff*, the subject ICG Agreements, as well as the Exchange Agreement, each provided that they would be governed by and construed according to the laws of the Commonwealth of Kentucky.

Here, the terms of the ICG Agreements and the Exchange Agreement unequivocally evidence the parties' intent that the 2008 Transaction Agreements form one indivisible contract. The 2008 Transaction Agreements were executed contemporaneously on June 23, 2008, by and between the same parties, they all relate to the same subject matter, i.e., the operations of the

6

parties' respective mining operations. The Exchange Agreement specifically provided that the 2008 Transaction "shall be canceled and treated as if void and of no force and effect" unless the Easement and Disposal Agreements, along with other Ancillary Documents, were entered into at the Closing. [Exchange Agreement ¶ 2.6]. The Exchange Agreement defined the "entire agreement" to include the schedules and exhibits, and models of the Easement Agreement and Disposal Agreement were included as exhibits. The Easement Agreement and the Disposal Agreement both defined the "entire agreement" as including the Exchange Agreement. Finally, the sole consideration for the ICG Agreements was the various property rights that the parties exchanged pursuant to the Exchange Agreement and, with respect to the Disposal Agreement, the reciprocal rights granted to the parties in that agreement. *See In re Buffets Holdings, Inc.*, 387 B.R. 115 (Bankr. D. Del. 2008) (multi-part agreement is not severable if the parties entered into the agreement as a whole, without which there would have been no agreement); *Interstate Bakeries Corp.*, 751 F.3d at 963 (determining an asset purchase agreement and a license agreement were integrated under Illinois law where the agreements were executed the same date, both agreements defined the "entire agreement" as including both agreements, and a model of the license agreement was attached as an exhibit to the asset purchase agreement); *In re Physiotherapy Holdings, Inc.*, 506 B.R. 619, 626 (Bankr. D. Del. 2014) (considering whether agreements were executed at the same time as a factor in determining whether agreements were integrated). Here, the ICG Agreements constituted a portion of the consideration for the ICG Entities to enter into the Exchange Agreement and close the 2008 Transaction. The provisions of the ICG Agreements clearly and unambiguously evidence the parties' intent that the ICG Agreements are an integral, interdependent and non-severable part of the 2008 Transaction.

It is also appropriate for "courts considering the divisibility of a contract [to] look at the objects to be attained and the common sense of the situation." *Wagstaff Minnesota, Inc.*, 2012 WL 10623, at *3. The Debtors argued at the hearing that while the ICG Agreements are related to the Exchange Agreement, they serve a different purpose and are not required for the ICG Entities to continue their mining operations. According to the Debtors, the ICG Entities can continue to mine coal on the property transferred to them in the 2008 Transaction because they can build roads on other property, and spoilage from their mining operations can be placed on other property. This argument, however, ignores the stated purpose of the 2008 Transaction which was to remedy the cumbersome and illogical manner in which the parties initially obtained their rights and to enable *both* parties to conduct their respective coal mining operations more efficiently. As stipulated by the parties:

> Together with the property transferred in the property exchange, the Easement and Disposal Agreements permitted ICG to access and mine some of its reserves. *These agreements were an essential part of the consideration to IGC [sic] in the Exchange Agreement.*

[Joint Stips ¶ 20 (emphasis added)]. Subsequent changes in the parties' operations cannot defeat the parties' intent regarding the indivisibility of the ICG Agreements from the 2008 Transaction Agreements.

Finally, to the extent the Debtors argue that a severability clause in the Exchange Agreement supports the divisibility of the ICG Agreements from the 2008 Transaction, this argument is without merit. Specifically, the Debtors argue that if the ICG Agreements are rejected, they are unenforceable, and thus may be severed from the 2008 Transaction by virtue of the Exchange Agreement's severability provision, to-wit:

> 8.6 <u>Severability</u>. If any provision of this Agreement shall be determined to be contrary to law and unenforceable by any court of law, the remaining provisions shall be severable and enforceable in accordance with their terms, unless such

> unlawful an unenforceable provision is material to the transactions contemplated hereby, in which case the parties shall attempt, in good faith, to negotiate a substitute provision.

[Exchange Agreement, ¶ 8.6]. This argument is circular at best, and the severability clause in no way diminishes the conclusion that the ICG Agreements are part of an indivisible contract with the Exchange Agreement and remaining Ancillary Documents.

## CONCLUSION

The Court finds that the Easement Agreement and the Disposal Agreement constitute an indivisible part of the 2008 Transaction entered into among Little Elk and the ICG Entities. The Debtors have conceded that if the Court makes such a finding, then the Debtors cannot reject the ICG Agreements. Therefore, it is unnecessary for the Court to consider the other arguments of the parties. Based on the forgoing,

**IT IS HEREBY ORDERED**, that the Debtors' Motion for an Order Authorizing the Rejection of Certain Agreements with ICG Entities [Doc. 394] is DENIED.

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



Signed By:
*Tracey N. Wise*
**Bankruptcy Judge**
Dated: Thursday, July 31, 2014
(tnw)